

AUG 1 4 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

-------------------------------------------------------X

Nelson Willis,               :

    Plaintiff,              :

Index No. 4: 23cv 732
Judge Mazzant / Judge Johnson

    v.                      :

Adam M. Aron,                :

    Defendant.              :

-------------------------------------------------------X

## VERIFIED COMPLAINT

Nelson Willis
Pro Se
1405 County Road 208
Gainesville, Texas 76240

## **TABLE OF CONTENTS**

*Page*

PRELIMANARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

      **A.  July 13th, 2023** . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      **B.  July 21st, 2023 Protective Order Hearing** . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      **C.  Plaintiff Willis Procures Subpoenas** . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

      **D.  Defendant Aron Files Notice of Nonsuit Without Prejudice** . . . . . . . . . . . .20

      **E.  Pending Lawsuits** . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      **F.  Settled Lawsuits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23


FIRST CAUSE OF ACTION
    (Malicious Prosecution Under Texas State Law
    Against Defendant Adam Aron ) . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . .  24


SECOND CAUSE OF ACTION
    (Abuse of Process Under Texas State Law
    Against Defendant Adam Aron) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

THIRD CAUSE OF ACTION
    (Intentional Infliction of Emotional Distress Under Texas State Law
    Against Defendant Adam Aron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26


PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

-------------------------------------------------------X

Nelson Willis,                          :

      Plaintiff,                       :      **VERIFIED COMPLAINT**

                               :      Index No. _____

      v.                                :      **JURY TRIAL DEMANDED**

Adam M. Aron,                           :

      Defendant.                       :
-------------------------------------------------------X

Plaintiff, Nelson Willis, hereby brings this action pursuant to common law of the State of Texas to redress his legal rights, and alleges as follows:

## PRELIMINARY STATEMENT

1. In Texas the spirit of justice blows as strong as the southern wind, a lesson learned that has been whispered through our history. Texas children are taught this lesson because it's rooted in moral fiber and ethical fortitude. It tells them to stand tall against the bullies of the schoolyard and the unscrupulous giants of Wall Street, alike.

2. With boots firmly planted, Texans know that confronting injustice is not merely a duty, but a manifestation of character. They recognize that bullies, no matter how towering they may seem, are but paper tigers, flimsy and fragile when challenged. Just as a child musters the courage to face the tormentor by the swing set, so too must the Texans stand unyielding before the unchecked might of financial titans.

1

3.  In the end, it is not the roar of the bully, but the quiet resolve of the righteousness man that resonates. For in Texas, as in life, the truth holds its ground, revealing that strength is not in aggression, but in integrity; and that the most formidable power is found not in intimidation, but in honor. This is the way of the Texan, a path of dignity, and the unrealized destiny of Plaintiff Nelson Willis.

4.  Plaintiff Nelson Willis ("Plaintiff Willis") brings this action, in his pursuit of justice, in order to hold Defendant Adam M. Aron ("Defendant Aron") to account.

5.  On May 19th, 2023, Defendant Aron abused the judicial process when he filed a baseless petition for a protective order against Plaintiff Willis in the 235th Judicial District Court ("Court") of Cooke County, in the State of Texas, pursuant to Article 7B of the Texas Code of Criminal Procedure, in order to silence Plaintiff Willis from reporting fraud, disseminating and exposing Defendant Aron's role in the pernicious financial engineering scheme that was perpetrated against AMC Entertainment Holdings, Inc. ("AMC") shareholders and Defendant Aron's abject failure to rectify the AMC proxy voting issues to the U.S. Securities and Exchange Commission ("SEC").

6.  Plaintiff Willis was able to expose Defendant Aron's culpable state of mind once he filed his application for a subpoena and a subpoena duces tecum with the Court on July 28th, 2023.

7.  The two subpoenas were issued on July 28th, 2023 and were served on Defendant Aron's colleague, John Merriwether ("Mr. Merriwether"), in the early morning of July 31st, 2023.

8.  The two subpoenas ordered Mr. Merriwether to come to Texas in order to testify at the August 7th, 2023 protective order hearing as well as to produce documents.

9.  Subsequently, later that afternoon on July 31st, 2023, Defendant Aron's attorneys filed a motion with the Court pursuant to Rule 162 of the Texas Rules of Civil Procedure, nonsuiting all of the claims asserted against Plaintiff Willis without prejudice.

10. On July 31st, 2023 the spirit of justice prevailed for another Texan.

2

## PARTIES

11. At all times relevant to this action, Plaintiff Willis was a resident of Gainesville, Texas. Plaintiff Willis and his sister Andrea Bedell ("Ms. Bedell") became retail investors in the US Stock Market and owners of AMC stock when they first purchased common shares in AMC in 2021 through their joint Fidelity Investment account. As a result of the release of AMC preferred equity unit ("APE") on August 22nd, 2022, Plaintiff Willis and Ms. Bedell also received and hold APE shares in their Fidelity account.  Plaintiff Willis personally opened an additional investment account with Interactive Brokers where he purchased and holds AMC and APE shares since January 2023.

12. Defendant Aron has served as Chief Executive Officer, President, and a director of AMC since January 2016. On May 19th, 2023, Defendant Aron petitioned the Court, of Cooke County, in the State of Texas, for a protective order, pursuant to Article 7B of the Texas Code of Criminal Procedure, against Plaintiff Willis. On July 31st, 2023, after AMC's Vice President of Investor Relations, John Merriwether ("Mr. Merriwether") was served with Plaintiff Willis' subpoena and subpoena duces tecum,  ordering him to come testify at Defendant Aron's Protective Order Hearing slated for August 7th, 2023  and producing documents,  Defendant Aron's attorneys filed a motion pursuant to Rule 162 of the Texas Rules of Civil Procedure, nonsuiting all of the claims asserted against Plaintiff Willis without prejudice. Defendant Aron resides in Kansas and service can be effectuated at AMC's corporate office at 11500 Ash Street Leawood, KS 66211.

## JURISDICTION AND VENUE

13. This action is brought pursuant to common law of the State of Texas.

14. This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1332(a)(1), as Plaintiff Willis and Defendant Aron are completely diverse and the matter in controversy exceeds the sum or value of $75,000.

3

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within the boundaries of the Eastern District of Texas.

16. Declaratory relief is available pursuant to 28 U.S.C. §§2201 and 2202.

## JURY TRIAL DEMANDED

17. Plaintiff Willis demands a trial by jury on each and every one of his claims as pleaded herein.

## BACKGROUND

18. Prior to the worldwide spread of the COVID-19 pandemic, AMC was a "healthy, solvent company". AMC did have considerable debt—in the annual report that AMC filed with the SEC on February 28th, 2020, AMC disclosed that it had "a significant amount of debt," equal to "approximately $4,853.3 million of indebtedness ($5,010.7 million face amount)" as of December 31st, 2019. Still, AMC had recently become the largest movie theater chain in the world and reported approximately $5.471 billion in revenue for the year ended December 31st, 2019.

19. With the onset of the COVID-19 pandemic and accompanying drop in movie theater attendance, AMC faced an existential crisis. The pandemic forced AMC to close approximately 1,000 theaters, furlough most of its 30,000 employees, and burn millions of dollars to stave off bankruptcy.

20. AMC would find salvation with a group of retail investors like Plaintiff Willis and Ms. Bedell calling themselves "Apes," a play on the famous movie line "Together Apes strong" from the film Planet of The Apes.

21. In January 2021, the retail investors, banding together started to buy AMC stock in droves to save AMC.

22. The rescue of AMC by retail investors was a major goal of the so-called "meme stock" movement, consisting of retail investors who would coordinate to drive up the trading price of shares of select companies to counter the influence of short sellers / naked short sellers.

23. Retail stockholders in the "meme stock" movement seek to buy and hold stock for the long term.

24. It is incontrovertible that retail investors saved AMC.

25. In less than 72 hours, AMC went from impending bankruptcy to seeing its stock price rise 467%, with the hashtag #SaveAMC going viral.

26. The trading price of shares of AMC common stock further rose from $2.12 per share on December 31st, 2020, to $10.21 per share by March 31st, 2021.

27. By June 2nd, 2021, AMC common stock closed at $62.55 per share.

28. Many retail investors like Plaintiff Willis are still invested in AMC today.

29. Defendant Aron is the current Chairman and Chief Executive Officer of AMC.  Prior to Defendant Aron taking the reins at AMC in late 2015, AMC's total debt was a little over $200 million.  By the end of the year 2016, Defendant Aron caused AMC's debt to balloon to an insurmountable total debt of approximately $4.6 billion.

30. Defendant Aron and AMC took advantage of AMC's retail investor-boosted trading price to sell new shares, raising nearly $1.9 billion in gross proceeds.  In so doing, however, AMC exhausted its reserve of authorized Common Stock.

31. On January 27th, 2021, the AMC Board adopted a resolution proposing to amend AMC's Certificate to increase the total number of authorized shares of common stock by 500,000,000 shares to a total of 1,024,173,073 shares of common stock (the "First Certificate Amendment Proposal"), and resolved to submit that proposed amendment to a vote of the stockholders at AMC's May 4th, 2021 annual meeting (the "2021 Annual Meeting").

32. The proposal was met with considerable backlash from the retail investors. On April 27th, 2021, the AMC Board determined not to seek stockholder approval of the First Certificate Amendment Proposal.

33. According to the minutes of that AMC Board meeting, Defendant Aron

> **"explained that [AMC] now ha[d] an approximate 85% retail shareholder base" and "[m]ost of those stockholders are voting 'no' on share authorization because they want fewer shares, not more, to create scarcity to make it harder for the short sellers to borrow shares."**

34. Defendant Aron also noted that "even securing a 50% voting quorum is proving to be a challenge with this retail stockholder base as many don't vote and many of the shares have changed hands since the record date."

35. As a result, the AMC Board withdrew the First Certificate Amendment Proposal from the agenda for the 2021 Annual Meeting.

36. At a May 4th, 2021 AMC Board meeting, Defendant Aron "discussed the propriety of postponing Company's annual stockholder meeting and setting a new record date to provide a better opportunity to pass . . . the share authorization proposals."

37. The AMC Board recognized that "[a]uthorization may be difficult" because the share increase proposal would "[r]equire[] majority votes outstanding (225M votes)" and the "[i]nvestor base is widely dispersed, and heavily weighted towards retail investors."

38. Ultimately, the AMC Board postponed the 2021 Annual Meeting until July to try again to garner stockholder support to amend the Certificate.

39. On June 3rd, 2021, AMC issued a preliminary proxy for the then delayed annual meeting.

40. For the first time, the AMC Board disclosed that it approved a proposal to amend the Certificate to increase the total number of authorized shares of common stock AMC could issue by 25,000,000 shares to a total of 549,173,073 shares of common stock (the "Second Certificate Amendment Proposal"), which would be put to a stockholder vote at the rescheduled 2021 Annual Meeting. On July 6, 2021, AMC announced that it would no longer seek stockholder approval of the Second Certificate Amendment Proposal and withdrew it from the agenda for the 2021 Annual Meeting.

41. According to Defendant Aron and the AMC Board, AMC still needed to raise cash, but was left without the ability to fundraise by selling more shares of common stock.

42. Around November 2021, AMC and its financial advisor, Citigroup Global Markets, Inc. ("Citigroup"), began work on an alternative form of equity that could convert into common stock, termed "Project Popcorn."

43. In the spring of 2022, AMC and its advisors were focused on ways to use AMC's significant volume of authorized, but unissued preferred stock to effectively lower the voting standard to ensure AMC could amend its Certificate to permit it to increase the number of authorized shares of common stock outstanding.

44. On July 28th, 2022, after months of discussions, the AMC Board approved the creation of AMC Preferred Equity Units (i.e., APEs). The AMC Board recognized that the APEs might trade at a discount to shares of common stock because index funds would need to sell off approximately 75 to 78 million APEs.

45. On August 4th, 2022, AMC announced that it would initially issue APEs to existing holders of AMC's common stock as a special dividend.

46. In an August 18th, 2022 FAQ, AMC said that while the APEs could convert into shares of common stock, it "did not currently expect AMC to make such a proposal anytime soon."

47. When AMC announced the creation and distribution of the APEs, AMC stated that APEs had the same voting power as shares of AMC common stock (i.e., one vote each). AMC did not

7

well advertise that, pursuant to an August 4th, 2022 deposit agreement, Computershare, AMC's transfer agent, was required to vote uninstructed APEs proportionally with instructed APEs, effectively giving APEs superior voting power.

48. On September 26th, 2022, AMC disclosed that it had entered into an equity distribution agreement with Citigroup to sell 425,000,000 APEs from time to time in an at-the-market offering.

49. Through December 19th, 2022, AMC sold nearly 126 million APEs for $162.4 million of gross cash proceeds before fees and commissions.

50. Initially, the minimum price at which APEs could be sold was $2 per unit.

51. Following a plea from Defendant Aron after the share price for APEs fell below $2 per unit, an AMC pricing committee lowered the minimum to $1 per unit.

52. APEs then traded below $1 per unit, forcing AMC to stop selling additional APEs at then-market prices.

53. Defendant Aron then sought a new way to amend AMC's Certificate to increase the number of common shares outstanding.

54. In early December 2022, AMC and a hedge fund by the name of Antara Capital ("Antara") explored a potential transaction involving APEs.

55. On December 8th, 2022, Citigroup's Derek Van Zandt told Defendant Aron that "Antara agree[d] to hold shares until vote and vote in favor [of conversion],"which indicates that Defendant Aron was in favor of the transaction, at least in part, because Antara would vote to approve the Certificate Amendments, effectively guaranteeing they would be approved.

56. On December 22nd, 2022, AMC agreed to sell $110 million worth of APEs to Antara. In deciding to approve the Antara Transaction, the AMC Board specifically discussed that, given

8

that the APE unitholders would likely want to convert their units to shares of common stock, "AMC had a good chance to secure approval" of the Certificate Amendments.

57. Also on December 22nd, 2022, AMC announced that it would hold a special meeting of stockholders (i.e., the Special Meeting) to vote on proposals to amend AMC's Certificate to: (i) increase the authorized number of shares of common stock from approximately 524 million to 550 million shares authorized (the "Share Increase"); and (ii) thereafter effect a 1-for-10 reverse stock split of AMC equity (the "Reverse Stock Split," and collectively with the Share Increase, the "Certificate Amendments").

58. Upon approval, the Certificate Amendments would allow for, following the Reverse Stock Split, the full conversion of all outstanding APEs into shares of common stock, with each APE convertible to 1/10th of a share of common stock (the "Conversion").

59. On February 14th, 2023, AMC filed its definitive proxy statement (the "Proxy") for the Special Meeting. The Proxy disclosed that the Certificate Amendments required the affirmative vote of at least a majority of the outstanding common stock and preferred stock, voting together as one class. AMC also disclosed that, as of the record date, February 8th, 2023, for the Special Meeting, Antara owned 258,439,472 APEs, representing approximately 17.8% of AMC's total voting power and approximately 27.8% of all outstanding APEs. **Antara agreed to vote its APEs in favor of the Certificate Amendments at the Special Meeting, and with the mirrored-voting provision of the APEs, effectively guaranteed that the Certificate Amendments would be approved.**

60. On February 20th, 2023 Allegheny County Employees' Retirement System ("ACERS") filed its class action complaint in the Chancery Court in the state of Delaware, asserting claims for breach of fiduciary duty and violation of 8 Del. C. § 242(b)(2) ("Section 242"), declaratory, injunctive and equitable relief against AMC, Defendant Aron, current and former Board members Howard Koch, Kathleen Pawlus, Anthony Saich, Philip Lader, Gary Locke and Adam Sussman.

61. Also on February 20th, 2023, retail investors Usbaldo Munoz ("Munoz") and Anthony Franchi ("Franchi") filed their own class action complaint in the Chancery Court, asserting a claim for breach of fiduciary duty and seeking to enjoin the APEs from voting at the Special Meeting against Defendant Aron, current and former Board members Denise Clark, Howard Koch, Philip Lader, Gary Locke, Kathleen Pawlus, Keri Putnam, Anthony Siach, Adam Sussman and Lee Wittlinger.

62. On February 27th, 2023, the Chancery Court entered the Status Quo Order, which, among other things, allowed AMC to hold the Special Meeting but prevented AMC from effectuating the Certificate Amendments, if approved, pending a ruling by the Court on ACERS, Munoz and Franchi's preliminary injunction motion, and set a hearing on the motion for April 27th, 2023.

63. On March 14th, 2023, the Certificate Amendments "passed" at the Special Meeting. **Without the mirrored voting and the Antara Transaction, the proposals would not have passed— a fact acknowledged by AMC internally.[1]**

64. However, Defendant Aron would continue to mislead the retail stockholder base but not Plaintiff Willis.

65. On March 14th, 2023, Defendant Aron tweeted the following after the results were "tallied"

> **Today was a huge step forward for AMC. You voted YES, YES & YES! And it was a landslide vote too — 88% yes for Proposal 1, 87% yes for Proposal 2, and 87% yes for Proposal 3. My sincerest thanks for giving AMC the tools we need to continue fighting the good fight on your behalf.**

66. At the time, there were 517,580,416 eligible shares of AMC's Class A common stock and 929,849,612 eligible AMC Preferred Equity Units were available to vote. Based on AMC corporate's calculations, the votes for both AMC and APE shares were combined to determine the final results. Regarding the reverse split proposal vote AMC reported that out of

---

[1] Court of Chancery Case Number 2023-0215-MTZ Docket Index 206, Plaintiffs' Opening Brief in Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards at 27

approximately 929.8 million APE shares, 842,782,544 voted in favor, 80,570,613 voted against, and 6,695,864 abstained. In the case of AMC shares, 128,344,709 voted in favor of the reverse split proposal, while 51,388,638 voted against, and 2,609,383 abstained.[2]

67. According to the reported results, every APE share was voted and recorded, because approximately 63% of the APE share votes were voted and recorded on time, and AMC corporate instructed Computer Share to vote in favor of the proposals the remaining percentage (37%) who did not vote on time.

68. However, for AMC common shares, only 35% of the shares were voted and recorded. The difference between the voter turnouts for each class share (35% for AMC common vs 63% for APE) is highly statistically unlikely and should have immediately triggered a stockholder vote audit.  An audit of the stockholder vote would allow investigation of the raw voting data, the vote totals, and allow for stockholders to validate their votes were recorded correctly.

69. Defendant Aron and AMC Board rigged the reverse split and merger vote by combining the total yes votes for AMC, APE, the APE votes they sold to Antara and the transfer agent mirrored yes votes in order to say that the reverse split and conversion passed.

70. Additionally, AMC violated Section 242 by forcing both the AMC and APE votes to be held together instead of separately.

71. **All these steps were needed in order for AMC to unlawfully secure their desired outcome for the vote.**

72. The voting percentage contrast alone is alarming but when also considering the possibility of billions of synthetic shares/votes. Many stockholders both domestic and especially internationally reported not receiving their proxy voting materials.

---

[2] AMC Form 8k. March 15, 2023. Link: https://investor.amctheatres.com/financial-performance/sec-filings/sec-filings-details/default.aspx?FilingId=16490544

73. Per Defendant Aron on the Q4 2022 call (on February 28, 2023) stated

> **"we are all aware painfully that the brokerage firms in some countries, especially in Europe do not facilitate shareholder voting. And there's - if that - if you're with one of those firms, there's not much you can do other than put - your shares in a different broker who would allow you to vote at future shareholder meetings."** [3]

74. This issue where international stockholders are not allowed to vote is not new and has been referenced on previous calls including Q1 2022 and Q2 2022. So international stockholders may not be able to vote, however, given modern technology, it is inexcusable that AMC has not found a way to work with international stockholders to record their stockholder votes which they purchased legally when they bought their shares.

75. Defendant Aron and the AMC Board were aware that APE's mirrored voting power could be weaponized against holders of AMC Common Stock.

76. This became evident in an email sent to AMC's CFO Sean Goodman and Mr. Merriwether from D.F. King, which attached a model designed to show combinations of APE and AMC support that would achieve the requisite vote requirement.

77. Furthermore, internal communications revealed that the company's senior management focused on ensuring that Antara held shares and voted in favor of the conversion. The vote rigging allegations against AMC involve the company's use of the Antara Transaction to manipulate and undermine the common stockholders' voting rights.

78. By weaponizing APEs and their mirrored voting power, Defendant Aron and the AMC Board were able to force through the Certificate Amendments, circumventing the stockholders' franchise and breaching their fiduciary duties.

---

[3] AMC Entertainment Holdings, Inc. (AMC) CEO Adam Aron on Q4 2022 Results - Earnings Call Transcript. Seeking Alpha. Posted on Feb. 28, 2023 https://seekingalpha.com/article/4583134-amc-entertainment-holdings-inc-amc-q4-2022-earnings-call-transcript  Accessed on May 11, 2023

79. The evidence at hand indicates that the vote conducted on March 14th, 2023 was in fact unlawfully manipulated by Defendant Aron and the AMC Board. This assertion is substantiated by the correspondence exchanged between B. Riley and Sean Goodman and Mr. Merriwether from D.F. King. These communications reveal a concerted effort by the parties involved to distort the voting process to achieve a predetermined outcome - Implementation of a Proportional Voting Scheme.

80. An email chain involving Sean Goodman and Mr. Merriwether, dated May 31st, 2022, delineates a strategy whereby preferred equity could be utilized to transform the required voting standard from a "majority of shares outstanding" paradigm to a "majority of votes cast" paradigm.

81. This transformation could solely be realized through the deployment of a proportional voting scheme, further corroborating the contention that the vote was unlawfully manipulated to secure a specific outcome.

82. The cited correspondence between Sean Goodman and Mr. Merriwether and relevant parties evinces a deliberate endeavor to distort the voting process to achieve a preordained outcome.

83. By employing a proportional voting scheme, controlling the influence of Antara's investment, and modifying the voting standard, Defendant Aron and the AMC Board effectively manipulated the vote on March 14th, 2023 in an unlawful manner.

84. Since the introduction of APE, shareholder value has significantly diminished. As of July 3rd, 2023, AMC Common Stock closed at a price of $4.44 per share, and APE closed at a price of $1.76 per unit. "Accordingly, as of this date, the total market capitalization of Common Stock stood at $2,305,214,211 (based on 519,192,390 issued and outstanding shares of Common Stock), and the total market capitalization of APE amounted to $1,751,915,286 (based on 995,406,413 issued and outstanding APEs)." **As of July 3rd, 2023, the combined market capitalization of the company, for purposes of illustration, remained at $4,057,129,497. By subtracting the current total market capitalization of AMC and APE as of July 3rd, 2023 ($4,057,129,497) from the total AMC market capitalization before APE**

13

**($9,643,872,302.70), the resulting figure, $5,586,742,805, represents the total market value lost by AMC shareholders in less than a year.**

85. Of note that this initial market cap calculation calculates overall shareholder value lost, but this specific calculation does not calculate the percent of ownership that was lost.  In summary, through the inception of "Project Popcorn" and release of the APE share has resulted in billions of market cap value lost for shareholders, Defendant Aron breached his fiduciary duties by forcing dilution on all 3.8 million shareholders and as result helped protect  short selling firms that were betting against AMC.

86. As a result of this breach of fiduciary duty, Defendant Aron has lost the trust of many AMC shareholders such as Plaintiff Willis.

## STATEMENT OF FACTS

87. Plaintiff Willis is a congestive heart failure patient since June of 2022 and has been in/out of hospitals several times in the last year.

88. On March 7th, 2023, Plaintiff Willis was admitted to Presbyterian Hospital in Dallas to have heart ablation surgery performed on March 8th, 2023.

89. During the surgery, Plaintiff Willis was infected by *Staphylococcus* in his chest. Plaintiff Willis was then released on March 13th.

90. The following day, Plaintiff Willis placed a call to 911 from his house and he was transported via an ambulance to Texoma Medical Center and was kept overnight.

91.  Plaintiff Willis did not get released from the hospital until March 15th, 2023 at 4 pm.

92. On March 14th, while at Texoma Medical Center, Plaintiff Willis and Ms. Bedell cast their votes for only their APEs.

93. When Plaintiff Willis realized that both he and his sister did not receive their proxy voting statements for their AMC shares, he was extremely disappointed.

94. AMC's corporate voting process uses Proxy Vote for the majority of brokers so that shareholders can vote online (without having to show up in person) for agenda items determined to be voted on for shareholder meetings.

95. A few weeks before the meeting, shareholders generally receive an email from their investment broker that holds the instructions for proxy voting for each account that holds the applicable security. On speaking with other shareholders, some received proxy statements for both AMC and APE for each account that they held those securities (which would be the correct process), however, some shareholders did not receive their proxy statements or received the incorrect amount.

96. Plaintiff Willis and Ms. Bedell were two of the many AMC stockholders that did not receive their AMC proxy voting statements, they only received their APE proxy voting statements for the shares they held with Fidelity and Interactive Brokers.

97. With the incomplete number of proxy votes Plaintiff Willis received, he voted against the March 14th, 2023 proposals for a reverse split and merger.

98. After casting his vote, while lying down in his hospital bed, Plaintiff Willis decided to watch CNBC. While watching CNBC, he discovered that the AMC vote was "approved".

99. Plaintiff Willis sent four emails to Mr. Merriwether at AMC Investor Relations[4], on March 14th, 17th, 21st, and the 24th, 2023.

100.    With these emails Plaintiff Willis expressed his frustration with not getting his AMC proxy statement and demanded an explanation. At no point did he receive a response email from Mr. Merriwether or AMC Investor Relations.

---

[4] investorrelations@amctheatres.com

15

101.    On March 25th, 2023, after emailing Mr. Merriwether at Investor Relations multiple times, Plaintiff Willis' patience ran thin.

102.    Plaintiff Willis sent an angry email to Defendant Aron asking how he can advertise the voting proposals of a reverse split and merger were approved by shareholders when many shareholders such as himself never received the correct number of their proxy voting emails, therefore, they were not able to vote all their shares.

103.    If shareholders were not sent their current number of proxy votes and were unable to vote with the correct number of votes, then clearly the voting results were incomplete or possibly fraudulent. Despite Plaintiff Willis' concerns,  his emails to Defendant Aron were ignored.

104.    No one at AMC would entertain his question regarding his missing proxy statements.

105.    Plaintiff Willis sent some angrier emails and then finally, on April 3rd, 2023, Defendant Aron replied.

106.    Instead of entertaining Plaintiff Willis' inquiry and concern Defendant Aron said "I hope your parents are alive to see your hateful emails."

107.    Plaintiff Willis was not happy about that. He responded angrily. He then began reaching out to the SEC chair, Gary Gensler, and Hester Peirce and copied Defendant Aron and Mr. Merriwether on the emails.

108.    Plaintiff Willis gave the SEC notice  about him missing his AMC proxy statement and about the March 14th, 2023 rigged AMC Vote.

109.    Unbeknownst to Plaintiff Willis, Defendant Aron had filed a criminal harassment charge against him with the Leawood Kansas Police Department.

110.    On June 15th, 2023 at approximately 7:00 am, Plaintiff Willis was served with Defendant Aron's May 19th, 2023 petition.

## DEFENDANT ARON PETITIONS THE 235th JUDICIAL DISTRICT COURT FOR A PROTECTIVE ORDER AGAINST PLAINTIFF WILLIS

111.    On May 19th, 2023, Defendant Aron filed a petition with the Court for a protective order seeking the following relief against Plaintiff Willis:

### Temporary Ex Parte Protective Order

- Prohibiting Plaintiff Willis from communicating directly or indirectly with Defendant Aron in a threatening, harassing, or offensive manner;
- Prohibiting Plaintiff Willis from communicating in any manner with Defendant Aron (except through Defendant Aron's counsel or a person appointed by the Court); and
- Prohibiting Plaintiff Willis from engaging in conduct directed specifically toward Defendant Aron that is reasonably likely to harass, annoy, abuse, torment, or embarrass him including, but not limited to, communications about Defendant Aron to others, including to other corporate mailing and email addresses of AMC and to the **SEC.**
- Defendant Aron requests that the Temporary Ex Parte Protective Order be effective until a hearing can be held for entering a Protective Order.

### Protective Order

- Prohibiting Plaintiff Willis from communicating directly or indirectly with Defendant Aron in a threatening, harassing, or offensive manner;
- Prohibiting Plaintiff Willis from communicating in any manner with Defendant Aron (except through Defendant Aron's counsel or a person appointed by the Court); and
- Prohibiting Plaintiff Willis from engaging in conduct directed specifically toward Defendant Aron that is reasonably likely to harass, annoy, abuse, torment, or embarrass him including, but not limited to, communications about Defendant Aron to others, including to other corporate mailing and email addresses of AMC and to the **SEC.**
- Defendant Aron requests that the Protective Order be effective for the duration of Plaintiff Willis' life.

112.    In Defendant Aron's petition, he alleges in allegations number 8 and 9 that Plaintiff Willis on April 3rd, 2023, using the email address "nelsonwillis3@gmail.com", Plaintiff Willis began repeatedly sending harassing, threatening, and offensive emails to Defendant Aron and about Defendant Aron to others.  Many of the emails contain hateful speech qualifying as ethnic slurs to and about Defendant Aron.  Defendant Aron alleges that Plaintiff Willis' conduct constitutes stalking under Section 42.072 of the Texas Penal Code.

113.    Defendant Aron's petition was assigned cause number CV23-00179 and a hearing on Defendant Aron's application for a protective order was scheduled for July 13th, 2023 at 3:00 pm.

114.    On July 7th, 2023, Plaintiff Willis filed his 60 page opposition, which included his 30 page affidavit and over 20 exhibits, with the Court and served Defendant Aron's attorneys via email.

**July 13th, 2023**

115.    On July 11th, 2023, Plaintiff Willis filed an agreed motion for a continuance with the Court. His motion was granted and the protective order hearing was rescheduled for July 21st, 2023.

**July 21st, 2023 Protective Order Hearing**

116.    On July 21st, 2023, at approximately 3:00 pm, Plaintiff Willis made his appearance in Court, courtroom 217, for the scheduled protective order hearing before the Honorable Judge Janelle Haverkamp ("Judge Haverkamp"), the matter of Petitioner Adam Aron vs Respondent Nelson Willis, Cause No. CV23-00179.

117.    That afternoon, Judge Haverkamp took appearances and recognized that Defendant Aron was not present in the courtroom.

118.    Judge Haverkamp addressed Defendant Aron's attorney inquiring where her client was.

18

119.   Defendant Aron's attorney responded that she was not aware of Defendant Aron's location, however, that she was prepared to proceed without him, and that she had some evidence in the form of an affidavit.

120.   Judge Haverkamp chastised Defendant Aron's attorney for her attempt to make a mockery of the protective order proceeding. Judge Haverkamp cited the 6th amendment, stating that Plaintiff Willis had a Constitutional right to cross examine Defendant Aron.

121.   At this point, Judge Haverkamp rescheduled the protective order hearing setting it for August 7th, 2023.

**Plaintiff Willis Procures Subpoenas**

122.   On July 28th, 2023, Plaintiff Willis made an application before the Court for a subpoena and a subpoena duces tecum ordering Mr. Merriwether to:

- **personally appear on the 7th of August, 2023 at 2:00 pm before the Honorable 235th Judicial District Court of Cooke County, Texas, and there to testify and the truth to speak on behalf of Plaintiff Willis; and**
- **commanded to produce and permit inspection and copying books, papers, documents or other tangible things.**

123.   On July 28th, 2023, Plaintiff Willis' application was granted and his subpoenas were issued by the Johnson County District Court in Olathe Kansas, instructing the sheriff of Johnson County, Kansas to effectuate service on Mr. Meriwether with Plaintiff Willis' subpoenas.

124.   On July 31st, 2023, between 8:30 am and 9:30 am, the sheriff served Mr.  Merriwether with Plaintiff Willis' subpoenas.

**Defendant Aron Files Notice of Nonsuit Without Prejudice**

125.    Subsequently, on July 31st, 2023, at approximately 5:58 pm, Plaintiff Willis was served with Defendant Aron's motion - Notice of Nonsuit Without Prejudice, pursuant to Rule 162 of the Texas Rules of Civil Procedure. Defendant Aron nonsuited all of the claims asserted against Plaintiff Willis.

<u>See</u> Exhibit A

126.    On May 19th, 2023, Defendant Aron abused the judicial process when he filed a baseless petition for a protective order against Plaintiff Willis, a valid AMC stockholder, in order to silence Plaintiff Willis from reporting fraud, disseminating and exposing his role in the pernicious financial engineering scheme that was perpetrated against AMC shareholders and his abject failure to rectify the proxy voting issues to the SEC.

127.    Plaintiff Willis was maliciously prosecuted for 46 days.

128.    Through Defendant Aron's protective order petition, he was able to procure a temporary ex parte protective order against Plaintiff Willis,  that lasted for 46 days.

129.    On July 31st, 2023 the spirit of justice prevailed for another Texan.

130.    Back on June 7th, 2021 at 11:24 am, Defendant Aron made the following representation to AMC shareholders via his Twitter Account, Twitter handle @CEOAdam.

> "The financial press has banner headlines about how innovative AMC and I are in reaching out to our individual investors. Odd that they praise something so obvious. **CEO's and professional management teams should listen to shareholders. You own our company, we listen to you. Adam**"

131.    Defendant Aron has hosted over a dozen meet and greet events at both AMC and Odeon movie theatres across the USA and across the world.  At these events Defendant Aron consistently speaks the narrative publicly that he is a CEO that works for shareholders and hears the shareholder concerns.

132.   Defendant Aron also pushes this narrative during public AMC Earnings Calls, during broadcasted interviews, and on his own personal Twitter account.

133.   However, when shareholders report serious issues such as not having correct voting rights or loss of stock value, Defendant Aron ignores their concerns or in this case lashes out against shareholders.

## LAWSUITS FILED AGAINST DEFENDANT ARON EXPOSING HIS SCHEMES

**Pending Lawsuits**

### 2023-0215-MTZ Consolidated Delaware Chancery Court

134.   The lawsuit, filed by Allegheny County Employees' Retirement System and  Usbaldo Munoz and Anthony Franchi, sued AMC and current and former Board members Howard Koch, Kathleen Pawlus, Denise Clark, Anthony Saich, Philip Lader, Keri Putnam, Gary Locke and Adam Sussman,  and Lee Wittlinger  on February 20th, 2023 in Delaware's Chancery Court. The action challenges a course of complex and disloyal corporate engineering by the Defendants—described by Defendant Aron as an exercise in "3-D chess"—devised to achieve a simple aim: **eviscerating the voting power of AMC's Class A stockholders in order to force through approval of a proposed dilutive share count increase that those stockholders repeatedly had rebuffed and were not willing to support at the corporate ballot box.**

135.   The April 27th, 2023 preliminary injunction hearing was adjourned after both parties gave the Court notice that they agreed to a settlement, **just four days before Defendant Aron's deposition**.  As a result of the settlement, discovery concluded with **not one board member being deposed**, this after Defendant Aron once again misled his shareholders during AMC's 4th Quarter Earnings Call held on February 28th, 2023, stating that **he would "defend the lawsuits vigorously".**

21

136.    On June 29th and 30th, a settlement hearing was held for two days before Judge Zurn.  The engagement by retail investors has been through the roof with  volume of objections received to the proposed settlement was nothing short of eye-popping - over 3000, including letters from retail investors calling out Defendant Aron and his schemes.

## N23C-05-045 – Delaware Superior Court

137.    The lawsuit, filed by AMC, sued **nearly 20 insurance companies** on May 5th, 2022 in Delaware's Superior Court, claiming the insurance companies are breaching its liability policies **by refusing to cover the cost** of prosecuting the 2023-0215-MTZ class action lawsuit that AMC plans to settle for more than $100 million. Lead Counsel are seeking $20 million in legal fees as part of the proposed settlement which AMC claims the insurance companies polices are supposed to cover plus defense attorney fees which is running at over $4 million. "These claims fall squarely within defendants' coverage obligations," meaning they're "obligated to, among other things, pay 100% of the defense and settlement costs," AMC said in its 35-page complaint against 17 liability insurers, including XL Specialty Insurance Co., Continental Casualty Co., and Great American Insurance Co.[5]

## 2023-cv-04985 – Southern District Of New York

138.    The lawsuit, filed by two AMC investors, accuses the hedge fund Antara, its affiliates, and founder Himanshu Gulati of making more than $20 million on sales of APE units and AMC common stock purchased less than six months earlier. Federal securities laws require corporate leaders and major stockholders to give such short-swing profits back to the company, a rule meant to curb insider trading. The complaint filed in Manhattan federal court opens a new legal front in the bitter fight over the APE units, which have been the subject of fierce litigation in Delaware's Chancery Court since February. The case has pitted AMC and Defendant Aron

---

[5] AMC Sues Insurers Over APE Dispute as Lawyers Seek $20 Million (bloomberglaw.com)

against many of the retail investors who participated in the "meme stock" rally that rescued the movie theater chain from a pandemic-era bankruptcy.

## Settled Lawsuits
### 2019-0303-JRS - Delaware Chancery Court

139.    The lawsuit, filed by one AMC investor by the name of Linda Lao, arising from a conflicted three part transaction involving, the majority stockholder (Wanda), and Silver Lake. On September 14th, 2018, AMC announced three linked transactions. The transactions were not driven by the needs of the Company or its public shareholders. Rather, they were designed to solve a problem for AMC's controller, Wanda and Wanda's controller, Wang. Starting in the spring of 2017, Chinese regulators began a crackdown on highly leveraged Chines companies, including Wanda. Responding to the regulatory shift required Wanda to significantly reduce its outstanding debt. The three linked transaction process was unfair. Despite the obvious conflicts inherent in this related-party transaction, AMC's Board of Directors failed to impose appropriate safeguards to protect the interests of Linda Lao and other public stockholders. The matter was settled which provided for a cash payment of $17.375 million, which, after deducting any fee and expense award to Linda Lao's attorney and any applicable taxes, was paid to AMC. In Judge Zurn's decision to approve the settlement, she described Defendant Aron as a double agent citing the WeChat text thread and the investigation conducted by the Special Litigation Committee.

23

### FIRST CAUSE OF ACTION
### MALICIOUS PROSECUTION UNDER TEXAS STATE LAW AGAINST
### DEFENDANT ADAM ARON

140.   Plaintiff Willis repeats, reiterate, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

141.   By virtue of the foregoing, Defendant Aron initiated, continued, and caused the initiation and continuation of an application for a baseless protective order against Plaintiff Willis, pursuant to Article 7B of the Texas Code of Criminal Procedure.

142.   The protective order proceeding was terminated in Plaintiff Willis' favor on July 31st, 2023.

143.   There was no probable cause for the commencement or the continuation of the protective order proceeding.

144.   Defendant Aron acted with actual malice.

145.   As a result of Defendant Aron's impermissible conduct, Plaintiff Willis was injured and harmed.

146.   Accordingly, Plaintiff Willis demands judgment against Defendant Aron in a sum of money to be determined at trial.

### SECOND CAUSE OF ACTION
### ABUSE OF PROCESS UNDER TEXAS STATE LAW AGAINST
### DEFENDANT ADAM ARON

147.   Plaintiff Willis repeats, reiterate, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

24

148.    Specifically, on May 19th, 2023, Defendant Aron abused the judicial process when he filed a baseless petition for:

- a protective order against Plaintiff Willis in the 235th Judicial District Court of Cooke County, in the State of Texas, pursuant to Article 7B of the Texas Code of Criminal Procedure.

- The application for a protective order was filed in order to silence Plaintiff Willis from reporting fraud, disseminating and exposing Defendant Aron's role in the pernicious financial engineering scheme that was perpetrated against AMC Common stockholders to the SEC.

- The application for a protective order was also filed in order to silence Plaintiff Willis from disseminating and exposing Defendant Aron's abject failure in rectifying the AMC proxy voting issues to the SEC.

- The application for a protective order was also filed in order to silence Plaintiff Willis who has been awakened to Defendant Aron's antics, lip service, and misrepresentation.

149.    Defendant Aron's abuse of process enabled him to procure a temporary ex parte protective order against Plaintiff Willis that lasted for 46 days.

150.    This pernicious financial engineering scheme has now been completely exposed as a result of discovery in a pending matter in the Chancery Court out in Delaware, case number 2023-0215-MTZ before Judge Zurn.

151.    The continuation of the petition for a protective order against Plaintiff Willis while lacking probable cause was done so in order to cover up Defendant Aron's role in the pernicious financial engineering scheme.

152.    Defendant Aron used such process in a perverted manner to obtain a collateral objective outside the legitimate ends of the process used.  Defendant Aron did so with an intent to do harm to Plaintiff Willis, with actual malice, and without excuse or justification.

153.    As a result of Defendant Aron's impermissible conduct, Plaintiff Willis was injured and harmed.

154.    Accordingly, Plaintiff Willis demands judgment against Defendant Aron in a sum of money to be determined at trial.

## THIRD CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## UNDER TEXAS STATE LAW AGAINST
## DEFENDANT ADAM ARON

155.    Plaintiff Willis repeats, reiterate, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

156.    Defendant Aron's conduct, in making a baseless application for a protective order on May 19th, 2023 was careless and negligent as to the emotional health of Plaintiff Willis and caused him severe emotional distress.

157.    The acts and conduct of Defendant Aron was the direct and proximate cause of injury and damage to Plaintiff Willis.

158.    As a result of Defendant Aron's impermissible conduct, Plaintiff Willis was injured and harmed.

159.    Accordingly, Plaintiff Willis demands judgment against Defendant Aron in a sum of money to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief jointly and severally against Defendant Aron:

A. Assume jurisdiction over this matter;

B. Declare that Defendant Aron's actions violated Plaintiff Willis' shareholder rights;

C. Award Plaintiff compensatory damages to be determined at trial, but in all events no less than $3 million;

D. Award Plaintiff exemplary damages to be determined at trial;

E. Award Plaintiff its reasonable fees, costs, and expenses; and

F. Grant such other and further relief as the Court deems just and proper.

Dated: Gainesville, Texas
August 14th, 2023

Nelson Willis
Pro Se
1405 County Road 208
Gainesville, Texas 76240

## STATEMENT OF VERIFICATION

Nelson Willis, being duly sworn deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Plaintiff Nelson Willis

Sworn to before me this

___14th___ day of ___Aug.___, 2023

NOTARY PUBLIC

CINDY HAMMER
Notary Public, State of Texas
Comm. Expires 04-10-2027
Notary ID 131967727

28