

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

FILED

MAY 3 0 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

NELSON WILLIS
          Plaintiff,

vs.

ADAM M. ARON
          Defendant.

Case No.: 4:23-CV-732-ALM-KPJ

Judge Amos L. Mazzant, III

---

## PLAINTIFF NELSON WILLIS' MOTION FOR A TEMPORARY RESTRAINING ORDER

---

Your Honor,

Hereby I, Nelson Willis, Pro Se litigant respectfully refile my Motion for a temporary restraining order pursuant to the Civil Procedure 28 USC App. Fed. R. Civ. P. Rule 65 and a brief in support.

## **APOLOGIZE**

First and foremost, Plaintiff respectfully wants to apologize to the honorable court the previous filing from May 14, 2024 [Dkt. 35]. It was unfinished, not well taken and filed in panic after another emotional breakdown. Plaintiff – *the disturbed, profane, antisemitic bigot who imagines conspiracies[1]* only tries to do the right thing, not just for himself, but other shareholders who have been significantly financially harmed by defendants' deceptive actions. Plaintiff promises to do better in the future.

---

[1] As described on pg. 3 of DEFENDANT ADAM M. ARON'S RESPONSE TO PLAINTIFF'S MOTION FOR EMERGENCY HALT AND CEASE-AND-DESIST REQUEST [Dkt. 36]

Re: Willis vs Aron Case Number 23-CV-00732

*Page 1*

## FACTUAL BACKGROUND

With the forthcoming annual meeting and shareholder vote scheduled for June 5, 2024, defendant Aron has again planned to disenfranchise shareholders like Plaintiff of AMC Entertainment Inc., he is CEO of. The recent Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 dated April 5, 2024 includes non-beneficial changes for shareholders. The reasoning to file a temporary restraining order on that scheduled vote is to prevent recurrent voting manipulation – as further shown in this motion.

There is not, sufficient time for Plaintiff to build the necessary discovery record between now and the vote scheduled for June 5, 2024 to enforce accountability. Accordingly, Plaintiff seeks an Order temporarily restraining Defendant Aron from proceeding with the planned vote on the Proposals until Plaintiff has had the opportunity to take expedited discovery in support of its claims and to present a motion for a preliminary injunction for this Court's consideration. Plaintiff proposes that the planned vote be postponed for sixty (60) days from expedition to allow for expedited discovery and a hearing on Plaintiffs' motion for a preliminary injunction. It is in the power of the CEO to pull a vote as he has done it before.

As detailed below, Plaintiff meets the standards for a temporary restraining order and for expedition. Plaintiff can provide undeniable evidence that the last two shareholder votes were indeed manipulated.

## I.    THE MANIPULATED MARCH 14, 2023 SHAREHOLDER VOTE

1. The Board of Directors has deliberately manipulated a shareholder vote on March 14, 2023. In the Opinion of *IN RE AMC ENTERTAINMENT HOLDINGS, INC. STOCKHOLDER LITIGATION* Vice Chancellor Morgan T. Zurn EFiled July 21, 2023 (Transaction ID 70454004 Case No. 2023-0215-MTZ) **[EXHIBIT A]** clearly states the following on page 22/23:

> *"A majority of common stockholders and a majority of the APE unitholders did not give any voting instructions at all, let alone in favor of the Proposals.  The Proposals passed only because of the APEs' mirrored voting feature and Antara's promised APE votes. AMC acknowledged that fact internally."*

> *"But only 35.23% of the 517,580,416 outstanding shares of common stock were present and voted at the Special Meeting, meaning only 25.54% of the outstanding common voted for the Share Increase Proposal, and 24.80% for the Reverse Split Proposal."*

2. Further Vice Chancellor Zurn makes undeniably clear:

> *"The defendants continue to misrepresent the nature of the vote by including the uninstructed mirrored votes in the total. In this litigation, the defendants have touted, "AMC's Proposals to authorize additional shares of Common Stock and convert the APEs into Common Stock were overwhelmingly supported by holders of both APEs and Common Stock."*

3. The board used a hidden, unethical and complex scheme to overthrow his shareholders while simultaneously lying about the underlying facts to the public.

4. On February 20, 2023 the Plaintiffs of the lawsuit filed a request for a court issued "Temporary Restraining Order" (herein "TRO"). The Brief was filed with Transaction ID 69181648 *IN RE AMC ENTERTAINMENT HOLDINGS, INC. STOCKHOLDER LITIGATION* **[EXHIBIT B].**

5. In that brief, the Plaintiff's used the "irreparable harm argument" successfully to get the "Status Quo Order" granted in the first place.

> *"Here, absent a temporary restraining order and expedition, Plaintiff and the other common stockholders of AMC will be damaged irreparably, with only highly speculative and hypothetical means of unwinding Defendants' proposed amendments to AMC's*

*Charter and proposed conversion." "Indeed, if the March 14 stockholder vote goes forward and the Proposals are adopted, each existing APE unit will convert into shares of AMC common stock traded publicly on the NYSE— resulting in **__SIGNIFICANT ECONOMIC HARM__** to the Company's existing Class A Stockholders. If the Court were to later find that the conversion results from a breach of fiduciary duty or that the Preferred Stock was never properly authorized, it does not appear that there would be any practical means of unwinding that conversion— which, as noted above, would **__result in significant dilution of the economic and voting rights of AMC's common stockholders__** as a class. See Police & Fire Ret. Sys. of City of Detroit v. Bernal, 2009 WL 1873144, at \*2 (Del.Ch., 2009)"*

6. Merely because the "parties" have deceitfully concocted a resolution and the Chancery court has, regrettably, approved a settlement that allows a corporate action based on a foundation of illegal voting fraud – a reality explicitly acknowledged in the court's initial opinion on the settlement (Transaction ID 70454004)  and the discovery documents – does not in any way invalidate or miraculously eliminate the underlying justifications that led to the issuance TRO on February 27, 2023 in the first place.

7. This undeniably implies that the initial decision of the Delaware trial court to grant the TRO was rooted in a crystal-clear understanding of the substantive, significant, irreversible, and imminent financial damage AMC Common Stockholders – Plaintiff is part of – would and sadly already have had faced.

8. On August 16, 2023 an AMC Common Shareholder filed a Motion for Status Quo pending appeal in the Delaware Supreme Court. For reasons not immediately apparent, the perplexing decision of the Chancery Court to lift the status quo order and deny a motion (Transaction ID 70620767) to let the status quo intact before a higher court can review an appeal **[EXHIBIT C]**. This decision diverged from the well-founded conclusions reached during the TRO proceedings, resulting in an apparent contradiction and oversight. It came as predicted. The stock

price of AMC Common has lost more than **93%** since March 14, 2023 which means, that a $100 invested on the voting day is worth today merely $7 and shareholder equity value was nearly eradicated.

9. Nevertheless, the facts are unquestionable for this court. The March 14, 2023 shareholder vote was manipulated with the planning, knowledge, intent and the execution of the board of directors of AMC Entertainment Inc. Plaintiff has provided the court with an exhaustive "Statement of facts" including all the details around the facilitated "Project Popcorn" *[Statement of Facts, 23-CV-00732 Dkt 1 Doc 26]* including the intent to amend the lawsuit. While Defendant was able to conclude a settlement in civil court, the civil court never had the jurisdiction to free Defendant from all federal personal (allegedly also criminal) claims thereof.

## II.   THE UNLAWFUL GRANTED NON-OPT OUT SETTLEMENT OF THE IN RE AMC ENTERTAINMENT. HOLDINGS, INC. STOCKHOLDER. LITIGATION DID NOT RELEASE PLAINTIFFS' PERSONAL FEDERAL CLAIMS

10. The Commonwealth of Delaware, through orders of Delaware Chancery Court, has not only violated Texas state residents' but also the right of shareholders all over the world, the right to due process under the Fourteenth Amendment by erroneously depriving holders of *personal*: Federal Securities claims, State claims and even future claims ("seller claims") rights to **property** without consent, consideration, or compensation.[2] The release of personal claims was granted in a **non-opt out settlement** *over the objections of 3,800 shareholders*, *id*, and a Petition with over 6,500 signatures from shareholders expressing their explicit wishes to opt out from a settlement based on fraud.[3]

---

[2] See: IN RE AMC ENTERTAINMENT. HOLDINGS, INC. STOCKHOLDER. LITIGATION Consol. C.A. No. 2023-0215-MTZ (August 11,2023)

[3] *See*: https://www.change.org/p/petition-to-opt-out-of-amc-s-proposed-class-settlement

*See also*: https://www.change.org/p/petition-to-opt-out-of-amc-s-proposed-class-settlement/u/31818119

11. *"(D)ue process requires at a minimum that an absent Plaintiff be provided with an opportunity to remove himself from the class." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812-813 (1985).* The August 11th Order of Delaware Chancery Court, disregards this bedrock principle anchoring American jurisprudence, causing irreparable harm to millions of people including Texas residents through an abuse of Article IV, Section 1 of the United States Constitution, and the Full Faith and Credit Act. **No notice** was given to holders of Federal Securities law claims and those that did object/request for an opt out of the release of claims **were erroneously overruled.** The Chancery court's reluctance to accommodate the explicit wishes of thousands of shareholders seeking to opt-out resonates as an *"act of tyranny"*, a distortion of the constitution, and a subversion of the judicial process – driven by the potentially vast financial interests of unscrupulous actors.

12. The Delaware court's treatment of due process issues raises profound concerns, particularly in the combination of denying and ignoring all motions for further investigations around the case, the conscious overlooking of notification shortfalls that excluded **approximately 1 million shareholders**. Characterizing this as an "imperfect" notification process is a blatant disregard of the constitutional principles that safeguard due process.

13. Extract MEMORANDUM OPINION from Judge Zurn **[EXHIBIT D]**:

   *"SCS also "mailed or emailed approximately 2.8 million post card notices to beneficial holders of AMC Common Stock. This is the majority of the 3.8 million stockholders the defendants' counsel represented owned common stock. Postcard notice was far from perfect. The notice administrator failed to mail, or facilitate mailing of, notice to approximately a million beneficial owners. One broker was significantly delayed in mailing postcards to another 1.5 million beneficial holders. The postcard sent recipients to a nonfunctioning URL that did not direct to the correct website. Future settling parties should not use this case as a model for distributing postcard notice. Still, on the unique facts of this case, I*

*conclude notice was adequate. Electronic notice was comprehensive."*

14. Notably, both parties in that case seek a swift validation of a settlement that stood tainted by allegations of fraud. This haste involved certifying lead Plaintiffs with questionable standing before the court and granting defendants of an overbroad legal immunity – including "unknown claims". Moreover, the court's endorsement of a reverse split merger that hinges on an alleged fraudulent voting process, as acknowledged by the court itself, adds further layers of complexity.

15. *"[A] cause of Action is a species of property." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). And if Congress "wishes to significantly Alter * * * the power of the Government over private property," It must "enact exceedingly clear language." U.S. Forest Serv. V. Cowpasture River Pres. Ass'n, 140 S. Ct. 1837, 1849-1850 (2020).* No such language exists, not federally, not in Delaware and not in ́Texas law. The Plaintiffs in the Delaware *state* class action were **never certified to represent _federal_ claims.** The Chancery court recognized this; finding federal claims were **personal property**, yet, never-the-less erroneously granted release of personal property absent notice - let alone consent, from holders of *personal* claims. Under the US Constitution notice, consideration and a right to be heard are core requirement before Delaware could deprive people including Texan citizens of personal property *"absent consent from the holder". Fuebtes v. Shevin, 407 U.S. 67, 81 (1972).* Delaware ignored these mandatory safeguards.

16. Class certification, of unrelated state claims, does not authorize a Plaintiff to releasing unrelated and uncertified personal property- absent consent from the holder. *Carey v. Piphus, 435 U.S. 247, 266–67 (1978); Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980); Nelson v. Adams, 529 U.S. 460 (2000).* To justify the release of Federal and Texas citizens personal claims, the **Delaware Chancery Court _had no jurisdiction_** over, the Chancery relied on internal case law from activist Chancellors *legislating from the bench.*

17. In the opinion approving an extremely broad release (legal immunity), the Delaware Chancery found it *"appears"* Delaware Law allows the extinguishing of Federal uncertified *personal* claims in the absence consent from the holder, or compensation for the claim and stands in direct contrast to established constitutional jurisprudence.[4] **Clearly, the US Constitution says otherwise.**[5]

18. The Vice Chancellor entering the order depriving Texas state residents and millions of shareholders all over the world a right to due process before the deprivation of property, has similarly disregarded the U.S. Constitution by depriving a gravely ill man (with a prescription for) Ivermectin finding: *"Even the terminally ill do not have a constitutional right to procure and use experimental drugs"*. See: *DeMarco v. Christiana Care Health Servs., 263 A.3d 423 (Del. Ch. 2021)*. Maybe this is the way Delaware treats it's residents, but this blatant disregard for the Constitution should not be tolerated in Texas.

19. Ironically, just a day before the Chancery Court order the Supreme Court *sua spote* granted *Certiorari* on a similar question of law where the U.S. Solicitor General argued Delaware's "interpretation of the (bankruptcy) Code would raise serious constitutional questions by extinguishing private property rights without providing an opportunity for the rights holders to opt in or out of the release."[6]

## III.   THE SECOND MANIPULATED VOTE: ANNUAL MEETING OF STOCKHOLDERS ON NOVEMBER 8, 2023

20. Because the company AMC Entertainment Inc. failed to schedule a timely annual shareholder meeting in 2023, it was sued [again] by shareholder

---

[4] See: IN RE AMC ENTERTAINMENT. HOLDINGS, INC. July 21 order at 51 (referencing federal claims as "personal" while citing *Activision: "it appears Delaware Law would permit the release of personal claims."*)
[5] See: *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006)*; See also: 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)*.
[6] See: *Harrington v. Purdue Pharma L.P., (Docket No. 23-124)*.

Kevin Barnes in *Barnes v. AMC Entertainment Holdings Inc., No. 2023-0718*, in the Delaware Court of Chancery.

21. Individual shareholder Kevin Barnes requested the Delaware Chancery Court to compel AMC to hold its next annual meeting by August 18, 2023 – before the implementation of the settlement of the previous case *IN RE AMC ENTERTAINMENT HOLDINGS, INC. STOCKHOLDER LITIGATION 2023-0215-MTZ*. The failure to hold the meeting by June or July 2023 was specifically not due to negligence.

22. Delaware law, under DGCL §211(c), mandates that if a company fails to hold an annual meeting for 13 months, shareholders have the right to sue. Barnes highlighted that two directors were appointed without shareholder elections, accusing AMC of "suboptimal governance" leading to "frequent litigation" since 2016. Indeed, there is no year since 2016, where the company has not faced litigation.

23. The Proxy statements were filed with the SEC on September 15 and 29, 2023, with the record date set as of September 25, 2023 for shareholders entitled to vote.

24. As of September 30, 2023, AMC reported 198,356,898 Class A Common Stock shares outstanding, each entitled to one vote.

25. In the 8K Report filed on November 9, 2023 with the SEC Item 5.07. Submission of Matters to a Vote of Security Holders the company states:

> "On November 8, 2023, AMC Entertainment Holdings, Inc. (the "Company") held its 2023 Annual Meeting of Stockholders (the "Annual Meeting"). A total of **_100,710,022_** out of 198,356,898 eligible shares of the Company's common stock were present in person or represented by proxy at the Annual Meeting. For the non-routine matters of electing directors and approving executive compensation on an advisory basis, 40,553,733 shares were voted after excluding broker non-votes. For the non-routine matters of amending the Company's Third Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), broker non-votes

*had the same effect as a vote against the proposal. For purposes of this report, all share and vote counts are rounded to the nearest whole number."*

26. Notably an astonishing amount of 97,646,876 votes (approx. 50%) were not "present" to vote. So, the question arises, where exactly are those shares if not held in brokerage accounts?

27. In the 2023 annual report the company states on page 37:

*"On February 21, 2024, approximately 1.8 million shares of our Common Stock were directly registered with our transfer agent by 15,110 shareholders. The balance of our outstanding Common Stock was held in "street name" through bank or brokerage accounts."*

28. In the Q3 2023 quarterly the company states on page 41:

*"As of September 30, 2023, approximately 1.6 million shares of our Common Stock were directly registered with our transfer agent by 15,130 stockholders. The balance of our outstanding Common Stock was held in "street name" through bank or brokerage accounts."*

29. From their own filings the company reports around 200 million shares outstanding – sold into the open market – only 1.6 – 1.8 million shares are held directly registered with their transfer agent and not held in "street name" in brokerage accounts all over the world. The discrepancy between the astonishing amount of more than 97 million shares which were not present at the vote is quite "unusual". Thus, another question arises, which supports the claim of improper notice or inadequate proxy material distribution to shareholders by the company. Has the company, overseen by the Board of Directors including Defendant fulfilled their legal obligation adequately?

30. According to Delaware General Corporate Law (DCGL) and federal law, the responsibility of the company to inform and empower shareholders to vote their entitled rights is crystal clear. DCGL §222(a) specifies the requirements for giving notice of shareholder meetings. SEC Rules under

the Securities Exchange Act of 1934 (such as Rule 14a-3 and Rule 14a-4) outline the specific content and delivery requirements for proxy materials to ensure that shareholders are fully informed **and able** to vote. The company has to "furnish" proxy materials to all shareholders entitled to vote. In this context "furnish" means that the company has a legal obligation to provide or make available the necessary proxy materials to shareholders in **a timely, accessible, and comprehensive manner,** either through traditional mail or electronic means.

31. The results of the November 8 vote itself are also quite interesting in the details. It showed a significant amount broker non-votes (60,156,289 shares) and overall low participation (50.77%). While nearly half of the shareholders didn't even "show up" to the vote, the supermajority of the shares were not instructed by shareholders in any way. To sum it up, 97,646,876 shares were not present and 60,156,289 not instructed are in sum 157,803,165 shares which represents nearly 80% of **ALL outstanding** common shares. The apparent lack of the supermajority shareholder participation suggests a potential failure in the duty of the company to furnish proxy materials timely and comprehensively.

32. In fact, since the "meme stock craziness" AMC has one of the **most active shareholder basis** in the world and defendant Aron itself acknowledged it by making public statements as of June 9, 2021 as he publicly stated:

> *"As of June 2, AMC had 501,780,240 total outstanding shares. AMC's number of shareholders in the U.S. and abroad has increased to about 4.1 million, and you own more than 80% of AMC. While some own more and some own less, the average stockholding for AMC is about 120 shares."*

As well as:

> *"There is a tremendous amount of inbound commentary to the company from our shareholder base, which is illuminating, because it*

*really helps us to understand what the owners of our company are thinking," Aron said."[7]*

33. The most interesting part of this November 8 vote is the comparison of it to historical data since the IPO of the company.[8] It shows an unusual evolution of the amount of Broker-non-votes and the overall vote participation of shareholders over time. Historical data indicates a drastic drop in participation post-2020, correlating with increased retail investor ownership, which does not seem to be "coincidence".

34. The following table presets all the relevant dates and the numbers:

| Date | Class of shares | Outstanding shares as of the date of the vote | Voting power total | Registered Broker-non-votes with the vote | Voted shares total | Vote participation | Percentage of Broker-non-votes (non instructed voting power) of the voted shares | Passive/ absent voting power total | Ratio of passive/ absent voting power |
|---|---|---|---|---|---|---|---|---|---|
| April 28, 2015 | Common Class A (1 vote per share) | 21.575.532 | 21.575.532 | 2.085.866 | 246.779.622 | 99,09% | 0,85% | 4.362.557 | 1,75% |
| | Common Class B (3 votes per share) | 75.826.927 | 227.480.781 | | | | | | |
| April 26, 2016 | Common Class A (1 vote per share) | 21.613.532 | 21.613.532 | 1.718.394 | 247.049.123 | 99,18% | 0,70% | 3.763.584 | 1,51% |
| | Common Class B (3 votes per share) | 75.826.927 | 227.480.781 | | | | | | |
| April 26, 2017 | Common Class A (1 vote per share) | 55.077.777 | 55.077.777 | 4.768.011 | 271.397.112 | 96,05% | 1,76% | 15.929.457 | 5,64% |
| | Common Class B (3 votes per share) | 75.826.927 | 227.480.781 | | | | | | |
| May 10, 2018 | Common Class A (1 vote per share) | 52.244.412 | 52.244.412 | 11.632.584 | 272.201.205 | 97,31% | 4,27% | 19.156.572 | 6,85% |
| | Common Class B (3 votes per share) | 75826927 | 227.480.781 | | | | | | |
| May 3, 2019 | Common Class A (1 vote per share) | 52.073.316 | 52.073.316 | 9.765.766 | 197.675.710 | 95,32% | 4,94% | 19.472.724 | 9,39% |
| | Common Class B (3 votes per share) | 51.769.784 | 155.309.352 | | | | | | |

---

[7] See: *https://www.businessinsider.com/amc-adam-aron-twitter-reddit-investors-meme-stock-2021-12*
[8] Notably Defendant Aron is CEO of the Company AMC Entertainment Inc. since 2016 (nearly the whole time since IPO in 2014)

| Date | Share Class | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| July 29, 2020 | Common Class A (1 vote per share) | 57.549.593 | 57.549.593 | 25.268.978 | 192.587.335 | 90,48% | 13,12% | 45.540.588 | 21,39% |
| | Common Class B (3 votes per share) | 51.769.784 | 155.309.352 | | | | | | |
| July 29, 2021 | Common Class A (1 vote per share) | 513.330.240 | 513.330.240 | 110.677.699 | 265.919.657 | 51,80% | 41,62% | 358.088.282 | 69,76% |
| June 16, 2022 | Common Class A (1 vote per share) | 516.820.595 | 516.820.595 | 123.812.644 | 268.775.910 | 52,01% | 46,07% | 371.857.329 | 71,95% |
| March 14, 2023 | Common Class A (1 vote per share) | 517.580.416 | 517.580.416 | 0 | 182.342.728 | 35,23% | 0 | 335.237.688 | 64,77% |
| | AMC PREFERRED EQUITY UNITS/ APE (1 vote per unit) | 929.849.612 | 929.849.612 | 0 | 929.849.612 | 100% | 0 | - | 0,00% |
| November 8, 2023 | Common Class A (1 vote per share) | 198.356.898 | 198.356.898 | 60.156.289 | 100.710.022 | 50,77% | 59,73% | 157.803.165 | 79,56% |

35. While the vote participation in 2015 was at 99%, in 2023 it reached merely 50.77%. The data shows no gradual decline in participation but rather a huge drop in the timeframe from 2020 to 2021. These are just the numbers which "showed up" to the respective votes. If these numbers are added with Broker-non-votes which stand for seemingly "passive" shareholders who don't give any voting instructions, the ratio of overall passive/absent voting power went from 1.75% (very low) to astronomical 79.56% (the supermajority of 4 of 5 shares are passive or absent). Plaintiff makes the argument this latest very high ratio cannot be explained through reasonable normal comprehensible means without having access to the underlying data. The historical analysis reveals that participation dropped from 99% in 2015 to around 50.77% in 2023. The ratio of passive/absent voting power has risen dramatically, suggesting possible broader shareholder disenfranchisement.

36. The following graph gives a visual expression of the evolution of voting participation of shareholders:



37. Hereby the question arises if the huge drop of voting participation – which is factually bonded to a very high ownership of retail investors since 2021 – was by choice or most likely involuntarily?

38. To answer this question Plaintiff will again show evidence from the of *IN RE AMC ENTERTAINMENT HOLDINGS, INC. STOCKHOLDER LITIGATION* to show a systematic scheme by the board of directors, which Defendant is CEO of, to undermine shareholder franchise. Previous

complaints demonstrate a pattern of inadequate shareholder communication and notification.

39. On June 9, 2023 an international shareholder (Efiled Jun 09 2023; Transaction ID 70171405) **[EXHIBIT E]** informed the court that he and his family members didn't receive any notification of the proposed settlement by the company or his broker. The only reason he was aware of the case was his self-activity in the case. This shareholder was not the only one who made this complaint before the Delaware court.

40. On June 7, 2023 Transaction ID 7014998 **[EXHIBIT F]** an AFFIDAVIT OF PAUL MULHOLLAND CONCERNING MAILING OF POST CARD NOTICE was filed with the Delaware court, where Mr. Mulholland President of Strategic Claims Services ("SCS" or the "Notice Administrator') lines out what he and his company have done to ensure that all shareholders get a timely postcard notice of the proposed settlement and how they can use their right to object to that settlement.

41. On Page 2 Mr. Mulholland points out:

*"As in most class actions of this nature, the large majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name" — ie., the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers. The names and addresses of **these beneficial purchasers are known only to the nominees**."*

42. On Page 3 of his affidavit, he further says:

*"Within five business days of receipt of a response from any nominee for beneficial holders of AMC Common Stock, SCS either mailed or emailed post card notices to such beneficial holders or provided the nominee with post cards to mail to such beneficial holders. Attached as Exhibit D is a list of the nominees who responded, when they responded, and when the mailing or emailing of the post card notice*

*to beneficial holders of AMC Common Stock was completed. Prior to May 31, 2023, SCS and nominees for beneficial holders of AMC Common Stock mailed or emailed approximately 2.8 million post card notices to beneficial holders of AMC Common Stock."*

43. The company AMC itself estimated 3.8 million different shareholders at that time. The procedure of informing shareholders should not be different as the procedure of distributing dividends of any company to all shareholders worldwide. So why is there such a large discrepancy of around 1 million shareholders who have not been noticed of the settlement at all? The CEO, defendant Aron had full knowledge of these facts.

44. A closer look into the corresponding *Exhibits A-D* of Mr. Mulhollands affidavit shows an obviously incomplete list of international Brokers and Banks which can explain the magical absence of shareholder notification all over the world. Big Brokers like Trade Republic, ING DiBa, eToro, Degiro from Europe are missing as well as Brokers from Asia e.g. DBS Vickers Securities, Hong Kong and Japan.

45. The incomplete list of brokers provided by the AMC in Mr. Mulholland's affidavit and missing notifications to shareholders suggests the company did not fulfill their legal obligation to provide or make available the necessary crucial information to shareholders in **a timely, accessible, and comprehensive manner,** either through traditional mail or electronic means. In that case shareholders were not notified of the proposed settlement, thus it clearly demonstrates a pattern of inadequate shareholder communication and notification. The only logical conclusive reason why shareholders abruptly did not participate in the votes since 2021 and a majority of shares were not specifically instructed, if they were not able to do so. As Plaintiff and his sister did not receive proxy materials for the March 14, 2023 vote – which was the original reason Plaintiff reached out to the company.

46. Further supporting the Plaintiff's claims, AMC faces [again] recent litigation (Case No. 2023-1259-LM) involving allegations from shareholders concerning the accessibility of company records. The suing

shareholder in this case specifically addresses issues related to the company's refusal to provide the requested records, which is a **basic right** of shareholders. The company's efforts to deny access to records[9], a fundamental shareholder right aligns with the data corresponding of deceitful voting manipulation and suggests a deliberate attempt to disenfranchise shareholders and manipulate voting outcomes.

## ARGUMENT

47. In support of this motion, Plaintiff invokes the weight of legal precedent and judicial wisdom of Your Honor's Court. It is Plaintiffs' humble belief that the principles embedded in the first three words of the US Constitution—*"We the People"*—carry the most important significance, safeguarding both due process and the sanctity of the constitution itself. Under the fourteenth amendment of the United States Constitution, release of personal federal claims, the Chancery Court had no jurisdiction to prosecute, and can only be released by consent from the holder, which the Chancery Court didn't get. Plaintiff never gave his consent to release personal federal claims, on the contrary Plaintiff explicitly formulated his objection as well as his wish to opt-out from the settlement. Yet Plaintiff was deprived of his due process right of the U.S. constitution – which is part of the reasoning seeking this TRO.

48. As Plaintiffs' motion has direct effect to the in Delaware registered company AMC Entertainment Inc. and their shareholders, Plaintiff gives also legal standard from Delaware that aligns with Texas standard and precedent. In Texas, corporate governance standards align closely with Delaware's principles regarding the protection of shareholder voting rights. To obtain expedited proceedings, a Plaintiff need only "articulate a sufficiently colorable claim and show a sufficient possibility of a threatened irreparable injury." *Gomi Inv'rs, LLC v. Schimmell Hldgs., Inc., 2006 WL 2304035, at *1 (Del. Ch. July 27, 2006).* A temporary

---

[9] Plenty of shareholders requested access, which was denied.

restraining order requires that the applicant satisfy the same elements needed for expedition along with showing that the balance of the hardships weighs in its favor. *See CBS Corp. v. Nat'l Amusements, Inc., 2018 WL 2263385, at \*6 (Del. Ch. May 17, 2018).*

49. The "chief focus" when reviewing a TRO motion is "the nature and imminence of the allegedly impending injury." Id. The colorable claim standard "merely requires the Plaintiff to present a nonfrivolous cause of action." *Tera v. HC2, C.A. No. 2020-0275-JRS, at \*69 (Del. Ch. Apr. 20, 2020) (TRANSCRIPT) (Trans. ID 65608468).* Delaware law is clear that "where boards of directors deliberately employ various legal strategies either to frustrate or completely disenfranchise a shareholder vote, there can be no dispute that such conduct violates Delaware law." *Coster v. UIP Companies, Inc., 255 A.3d 952, 961 (Del. 2021) (quoting Stroud v. Grace, 606 A.2d 75, 91 (Del. 1992)); see also Blasius Indus., Inc. v. Atlas Corp., 564 A.2d 651, 661 (Del.* Ch. 1988). *See also Sneed v. Webre, 465 S.W.3d 169, 186 (Tex. 2015) (citing Cates v. Sparkman, 11 S.W. 846, 859 (Tex. 1889)).*

50. In Texas, the standards for granting a temporary restraining order are similarly stringent. In *Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002),* the Texas Supreme Court articulated that to obtain a TRO, a Plaintiff must show (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

51. This aligns with the Delaware standard for expedited proceedings and TROs, which require a colorable claim and the possibility of threatened irreparable injury, as seen in *\*\*Freedman v. Texaco, Inc., 431 S.W.2d 195 (Tex. 1968)\*\**. It supports Plaintiffs argument by highlighting that irreparable injury is one for which there is no adequate remedy at law, making the injury unascertainable in damages which is also emphasized in *\*\*Campbell v. Wilder, 487 S.W.2d 146 (Tex. 1972)\*\**. Serious monetary damages post-vote as well as post reverse split – which Plaintiff already has suffered – cannot adequately remedy the impending harm by a

disenfranchised shareholder vote as the decisions made at such vote have long lasting implications for the company and the shareholders.

52. Furthermore, the primary [and only] purpose of the temporary restraining order Plaintiff is seeking is to preserve the status quo pending a trial on the merits. The status quo is defined as the "last, actual, peaceable, non-contested status which preceded the pending controversy." *Walling v. Metcalfe, 863 S.W.2d 56 (Tex. 1993)\*\**. Halting the upcoming vote preserves this status quo until the court can fully examine the merits of Plaintiffs' claims and defendants alleged crimes.

53. While Defendants characterization of Plaintiff as a "disgruntled shareholder"[10] is an ad hominem attack, showing [again] the character of Defendant, the response substantially fails to address the substantive legal and factual claims made in the Motion for TRO. Plaintiff's allegations, facts and data regarding stock manipulation, disenfranchisement of shareholders, and corporate governance issues including the 254-page Statement of Facts submitted by Plaintiff [Dkt. 26] provides detailed evidence supporting his claims and gives this honorable court a lot to consider.

54. Additionally, Defendant argues, the TRO Motion is irrelevant to the underlying claims of malicious prosecution, abuse of process, and intentional infliction of emotional distress. This is correct, and as Plaintiffs initially said, he is just trying to do the right thing. Plaintiff is also working on amending his complaint. The TRO Motion directly addresses the ongoing harm to shareholders, which is – in Plaintiffs opine - within this honorable court's purview to protect. Yes, the initial claims may focus on personal grievances, nonetheless the broader context of corporate as well as personal misconduct Plaintiff tries[11] to bring before this court's attention and its immediate impact on shareholders justifies judicial intervention – if the court will follow Plaintiff's arguments. The court has inherent equitable powers to issue orders to protect the rights of

---

[10] As described on pg. 1 OF DEFENDANT ADAM M. ARON'S RESPONSE TO PLAINTIFF'S MOTION FOR EMERGENCY HALT AND CEASE-AND-DESIST REQUEST [Dkt. 36]

[11] Almost imploring

parties and prevent irreparable harm – even if these parties are not part of this lawsuit – so far. The TRO is aimed at halting actions directly linked to Defendants conduct as CEO.

55. Furthermore, Defendant argues, that Plaintiff has not demonstrated a substantial likelihood of success on the merits. Well Plaintiff has provided exhaustive and substantial evidence of ongoing fraudulent activities, stock manipulation, and disenfranchisement demonstrating a pattern of pernicious financial engineering and scheming by Defendant and his associates. Numbers and Emails don't lie. The previous Delaware court rulings do not negate the specific and ongoing harms alleged by Plaintiff. In addition to that Plaintiff's reliance on federal securities laws and regulations underscores the legal basis for seeking emergency relief.

56. Defendant may argue that the upcoming shareholder vote is a routine governance matter – which it is indeed not. The June 5, 2024, vote is not a routine matter. It is the 2nd attempt by Defendant in collaboration with the Board of Directors of AMC to gain immunity for a series of corporate misdeeds. The proposals include amendments to the Certificate of Incorporation aimed at consolidating power and limiting shareholder rights, such as declassifying the Board of Directors, expanding exculpation provisions for officers, and changing rules around stockholder meetings and written consents. These actions, if approved, would further entrench the current management, and shield them from accountability for their actions,

57. The proposals for the June 5, 2024, vote are:

Proposal 1: Amend the Certificate of Incorporation to declassify the Board of Directors.

Proposal 2(a): If Proposal 1 is approved, elect nominees to the Board for terms expiring in 2025.

Proposal 2(b): If Proposal 1 is not approved, elect nominees to the Board for terms expiring in 2027.

Proposal 3: Amend the Certificate of Incorporation to eliminate the prohibition against stockholders acting by written consent.

Proposal 4: Amend the Certificate of Incorporation to remove the limitation on stockholders' ability to call special meetings.

Proposal 5: Amend the Certificate of Incorporation to expand the exculpation provision to limit the liability of certain officers.

Proposal 6: Ratify the appointment of Ernst & Young LLP as the independent registered public accounting firm for 2024.

Proposal 7: Conduct a non-binding advisory vote to approve the compensation of named executive officers.

Proposal 8: Approve the 2024 Equity Incentive Plan.

Proposal 9: Approve one or more adjournments of the Annual Meeting if necessary to permit further solicitation of proxies.

58. Plaintiff hopes, he has demonstrated before this honorable court that the request for a TRO is grounded in well-established legal principles from Texas and Delaware courts, which have been consistently upheld as well as facts and data. The TRO is necessary to prevent irreparable harm, preserve the status quo, and ensure shareholders are adequately protected pending a full hearing on the merits of this case.

---

## IV.
## CONCLUSION

THEREFORE, Plaintiff respectfully requests that the honorable Court will grant Plaintiffs Motion and allows further discovery in Plaintiff's case.

Sincerely and respectfully submitted,

Nelson E. Willis, III

1405 County Road 208

Gainesville, Texas 76240

972-533-4126

nelsonwillis3@gmail.com

## **CERTIFICATE OF SERVICE**

### **Case# 04:23-CV-732-ALM-KPJ**

I hereby certify that a true and correct copy of the foregoing:

**PLAINTIFF NELSON WILLIS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

has been forwarded by email to each attorney/party of record on this day May 30, 2024.

Richard A. Illmer
State Bar No. 10388350
Rick. Illmer@HuschBlackwell.com

Meghann Reeves
State Bar No. 24094499
Meghann.Reeves@HuschBlackwell.com

Nelson Willis
Pro-Se Litigant
1405 County Rd., 208
Gainesville, TX 76240
nelsonwillis3@gmail.com